ELIZABETH KRUIDENIER et al., appellants, v. W. E. McCULLOCH, Auditor of Polk County, HAROLD HUGHES, Governor, and members of Executive Council, LAWRENCE F. SCALISE, Attorney General, and ROBERT D. FULTON, Lieutenant Governor, appellees.

No. 52012.

(Reported in 142 N.W.2d 355)

1122

April 15, 1966.

David W. Belin of Herrick, Langdon, Sandblom & Belin, of Des Moines, for appellants.

Lawrence F. Scalise, Attorney General, and Timothy Mc-Carthy, Solicitor General, for appellees.

Per Curiam—The following opinion of Justice Mason, except for Divisions IX and XII and certain statements in Division XIII related thereto, is adopted as the opinion of the court with all Justices concurring therein, except that Justice Larson dissents from Division X of the opinion.

The opinion of Justice Stuart is adopted as the opinion of the court in lieu of said Divisions IX and XII and certain statements in said Division XIII related thereto.

Chief Justice Garfield and Justices Larson, Snell and Moore concur in the opinion of Justice Stuart.

Divisions IX and XII and the statements related thereto in Division XIII of the opinion of Justice Mason are a dissent to the opinion of Justice Stuart, with Justices Thornton, Rawlings and Becker joining therein.

Mason, J.—This suit was instituted by appellants, citizens and qualified voters of Cedar, Chickasaw and Polk Counties, one a state senator, another a representative, as a class action in their

own behalf and in behalf of other Iowa voters similarly situated. Defendants are state and county officials charged with performing various duties in connection with conducting elections in Iowa.

Plaintiffs' petition, as amended, in seven divisions, attacks the constitutionality of the temporary reapportionment plans adopted by the Sixtieth special session (Senate File 1, chapter 1) and Sixty-first (Senate File 568, chapter 88) General Assemblies as in violation of sections 1, 2 and 6 of Article I of the Iowa Constitution and the equal protection clause of section 1 of Amendment 14 to the United States Constitution. Constitutional questions are raised as to sections 34, 35, 36 and 37 of Article III of the Iowa Constitution and as to multimember districts. The relief sought is to obtain an adjudication the plans referred to are unconstitutional.

Defendants, by way of counterclaim, ask for declaratory judgment adjudging Senate File 568, Acts of the Sixty-first General Assembly (1965 temporary or statutory apportionment plan), to be a constitutionally valid interim plan of apportionment.

Trial to the court resulted in decree dismissing plaintiffs' petition and declaratory judgment declaring constitutional Senate File 568, Acts of the Sixty-first General Assembly, as an interim plan of apportionment. Plaintiffs appeal.

This is the second appeal in this case. See Kruidenier v. McCulloch, 257 Iowa 1315, 136 N.W.2d 546, which reversed the sustaining of defendants' special appearance and remanded the cause for trial.

I. The 1965 temporary reapportionment plan fixed the number of senators at 61 and apportions them in districts whereby each district has one senator except Polk County, which constitutes the 20th district, with five senators to be elected at large, except Black Hawk County (32nd district) and Linn County (24th district) each with three senators to be elected at large, and the following counties, each constituting separate districts, with two senators to be elected at large: Dubuque County (30th district) ; Pottawattamie County (13th district) ; Scott County (15th district) and Woodbury County (37th district).

The plan provides that the House of Representatives "shall be apportioned on a population basis." Forty-six counties would each comprise one district and each elect one representative, 17 additional districts are comprised of two counties each with each district entitled to one representative, and the counties of Louisa and Muscatine are combined into a single district with two representatives to be elected at large. In addition, said 1965 temporary reapportionment plan provides the counties of Cerro Gordo, Webster, Story, Jasper, Johnson, Clinton, Wapello, Marshall, Des Moines and Lee shall comprise one district each and each shall elect two representatives; Dubuque County shall comprise one district and shall elect three representatives; Pottawattamie County shall comprise one district and shall elect four representatives; the counties of Scott, Woodbury and Black Hawk shall comprise one district each and each shall elect five representatives; Linn County shall comprise one district and shall elect six representatives; Polk County shall comprise one district and elect eleven representatives.

II. The 1904 amendments (Article III, sections 34, 35 and 36) provided for express repeal of the same sections in the Constitution of 1857. Article III, section 34, as then amended, provides:

"The Senate shall be composed of fifty members to be elected from the several senatorial districts, established by law and at the next session of the general assembly held following the taking of the state and national census, they shall be apportioned among the several counties or districts of the state, according to population as shown by the last preceding census."

Article III, section 35, as amended, provides:

"The House of Representatives shall consist of not more than one hundred and eight members. The Ratio of representation shall be determined by dividing the whole number of the population of the state as shown by the last preceding state or national census, by the whole number of counties then existing or organized, * * *."

Article III, section 36, as amended, provides:

"The General Assembly shall, at the first regular session held following the adoption of this amendment, and at each

succeeding regular session held next after the taking of such census, fix the ratio of representation, and apportion the additional representatives, as herein before required."

The 1928 amendment contained no such repealer and dealt with only one section of the apportionment provisions (section 34) by adding thereto the words "but no county shall be entitled to more than one (1) senator."

Senate File 1 (the 1964 temporary reapportionment plan) was repealed by Senate File 568 (the 1965 temporary reapportionment plan) which was enacted as chapter 88, Laws of the Sixty-first General Assembly, June 3, 1965, after this action was commenced.

III. Divisions I and II of plaintiffs' petition allege the 1964 temporary reapportionment plan of the Iowa legislature should be declared invalid under sections 1, 2 and 6 of Article I of the state constitution and as in violation of the equal protection clause of section 1 of Amendment 14 to the Constitution of the United States because the plan provides that senators and representatives be elected at large from certain districts including the district of Polk County.

Divisions III and IV correspond to Divisions I and II except they attack the 1965 temporary apportionment plan as invalid under the state and federal constitutions because the plan does not have a uniform operation and grants to certain citizens or classes of citizens within the state of Iowa privileges or immunities which, upon the same terms, shall not equally belong to all citizens in that said plan provides for senators to be elected at large from certain districts including the district of Polk County. The issue plaintiffs urge is the constitutionality of at-large elections in multimember districts.

Division V asserts the method of apportionment of the Senate of the state of Iowa established by the original Constitution of the State as amended in 1904 and prior to the Amendment of 1928 is constitutional; the Amendment of 1928 that added to section 34, Article III, the phrase, "no county shall be entitled to more than one (1) senator", is unconstitutional; and therefore the apportionment of the Iowa Senate is governed by the provisions of the 1904 amendment, Article III, section 34, which

apportions the Senate on the basis of population and further declares that "The Senate shall be composed of fifty members"; the 1964 and the 1965 temporary reapportionment plans, each of which provides for more than 50 senators, are therefore unconstitutional.

Division VI is in the alternative and prays that the court find sections 34, 35, 36 and 37 of Article III of the Constitution of Iowa are each and all inseparable, that the provisions for apportionment found in said Article are invidiously discriminatory and therefore unconstitutional and void and the 1964 and 1965 temporary reapportionment plans do not have a uniform operation because they do not provide for subdistricting and are therefore unconstitutional. In this division plaintiffs attack the holding of the three-judge federal court that section 37, Article III, of the Iowa Constitution, is severable from sections 34, 35 and 36 of Article III.

Division VII is a combination of the prior provisions asking the court find the existing reapportionment plans unconstitutional because they do not provide for subdistricting and because they provide for a Senate of more than 50 members.

Briefly, plaintiffs make these allegations: (A) Polk County citizens vote for 11 legislators, single-member districts for only one, (B) Polk County citizens vote for five senators, single-member districts for only one, (C) Polk County residents do not have "identifiable constituencies", (D) The plan does not have a uniform operation and so citizens in Polk County are deprived of equal protection of the laws, (E) At-large elections result in block voting, (F) Multimember districts operate to submerge minority groups, (G) Single-member district legislators have more personal contact with their constituents, (H) A citizen in Polk County can exert pressure on 11 different representatives, (I) A legislative candidate from Polk County for the House has 16 times more people to contact than some other candidates for single-member districts, (J) A legislative candidate from Polk County for the Senate has seven times more people to contact than some other candidates in single-member districts, (K) In Polk County the plan tends to minimize and cancel out the voting strength of political elements of the voting population, (L)

Multimember legislative districts tend to minimize and cancel out the voting strength of rural areas in urban counties and minority political elements of the voting population.

IV. Other cases attacking the various apportionment plans of the legislature commenced in the United States District Court for the Southern District of Iowa are: Davis v. Synhorst, 217 F. Supp. 492 (1963), 225 F. Supp. 689 (1964), (affirmed, Hill v. Davis, 378 U. S. 565, 84 S. Ct. 1918, 12 L. Ed.2d 1037), 231 F. Supp. 540 (1964), Davis v. Cameron, 238 F. Supp. 462 (1965).

V. Defendants' answer denies the claim of discrimination, urges plaintiffs' action is not timely brought, asserts the questions in Divisions I and II are moot by reason of the decision of the three-judge federal court in Davis v. Cameron, supra, contends section 37 of Article III of the state constitution prohibits the dividing of counties and said Article cannot be declared to be unconstitutional under the state constitution. Defendants deny the 1965 temporary plan is in violation of the equal protection clause of section 1, Amendment 14 to the federal constitution, contend the judgment in Davis v. Synhorst, supra, affirmed by Hill v. Davis, supra, declares sections 34, 35 and 36 of Article III as invidiously discriminatory and declared to be prospectively null and void and inoperative for all future elections to the general assembly of the state of Iowa, except elections to fill the vacancies in the present general assembly. They assert the decision of the three-judge federal court, which plaintiffs contend is erroneous, has been affirmed by the United States Supreme Court in Hill v. Davis, supra. In answer to Division VII defendants incorporate much of their prior answer in order to place at issue the matters alleged therein.

VI. Plaintiffs assign as propositions relied on for reversal: (1) The trial court erred in failing to hold single-member districts in the Iowa legislature are required by Article I, section 6 of the state constitution. (2) The 1964 and 1965 temporary reapportionment plans which respectively provide for 59 and 61 senators are unconstitutional as in violation of section 34, Article III, of the state constitution; in the alternative, sections 34, 35, 36 and 37 of Article III are inseparable and where three of these provisions have been held federally unconstitutional, the fourth

must also fall and the trial court erred in holding to the contrary on both of these alternatives. (3) The trial court erred in failing to hold the multimember constituency apportionment scheme of the 1964 and 1965 temporary reapportionment plans violates the equal protection clause of section 1, Amendment 14, to the federal constitution.

VII. Plaintiffs assert in a brief point under their first proposition that uniform operation of laws and equality of privileges and immunities require that every Iowa voter is equal to every other Iowa voter when he casts his ballot in an election for state senator or state representative, there is no state constitutional prohibition against subdistricting, Article I, section 6, requires single-member districts in the Iowa legislature and they assert the temporary reapportionment plan which provides for multimember districts and single-member districts in each house of the legislature violates this particular section of the Bill of Rights of the state constitution which provides:

"All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."; that single-member districts in the Iowa legislature are required by this section and that the trial court erred in holding to the contrary.

VIII. We will first consider plaintiffs' contention that there is no constitutional prohibition against subdistricting, which presents the question: May a county be divided to form two or more senatorial or representative districts, each of them to be totally within such county? Answering the question involves an interpretation of the state constitution, and in this field we are the final arbiter. Kruidenier v. McCulloch, 257 Iowa 1315, 136 N.W.2d 546, 548, and citations; United Gas Pipe Line Co. v. Ideal Cement Co., 369 U. S. 134, 135, 82 S. Ct. 676, 677, 7 L. Ed.2d 623. When there is an unavoidable conflict between the federal and a state constitution the supremacy clause of course controls. Reynolds v. Sims, infra, 377 U. S., at 584, 84 S. Ct., at 1393, 12 L. Ed.2d, at 540.

Article III, section 37, as it now exists, which was the same in the 1846 Constitution as Article III, section 32, provides:

"When a congressional, senatorial, or representative district shall be composed of two or more counties, it shall not be entirely separated by any county belonging to another district; and no county shall be divided in forming a congressional, senatorial, or representative district."

Defendants assert and the trial court held this provision prohibits subdividing a county in forming a senatorial or representative district wholly within that county, i.e., what is commonly called subdistricting. Plaintiffs contend, however, section 37 prohibits only dividing a county and attaching the divided part to all or part of another county or other counties in forming a legislative district. Otherwise stated, the contention is that section 37, supra, does not proscribe establishing more than one district within a single county so long as it is not combined with territory outside the county.

We think the construction of section 37 for which plaintiffs contend is the more reasonable and hence adopt it. There is no division of a county within the meaning of this section as long as a senatorial or representative district is entirely within a specific county. Only if a senatorial or representative district were to take in a portion of two or more counties would there be a "divided" county in the formation of a district which is prohibited by this section. It is our duty to harmonize this section, if fairly possible, with other provisions of our state constitution, particularly, as applied to the present controversy, Article I, section 6 thereof, providing for uniformity and equality in legislative enactments. 16 Am. Jur.2d, Constitutional Law, sections 66, 67. The construction we give section 37, Article III, supra, gives full effect to both these provisions.

Further, if section 37, Article III, were construed to prohibit subdistricting of a single county where such subdistricting is necessary to provide equal protection of the laws, it would not only conflict with section 6, Article I, of our state constitution but it would violate the equal protection clause of section 1 of Amendment 14 to the federal constitution. Since the federal constitution is, of course, supreme, such a construction of section 37 would render it of no effect. McCulloch v.

Maryland, 4 Wheat (U. S.) 316, 426, 4 L. Ed. 579, 606; 16 Am. Jur.2d, Constitutional Law, section 54, page 226.

 It is a fundamental rule of statutory construction that where a statute is fairly open to two constructions, one of which will render it constitutional and the other unconstitutional or of doubtful constitutionality, the construction by which it may be upheld will be adopted. Mechanicsville v. State Appeal Board, 253 Iowa 517, 527, 111 N.W.2d 317, 323, and citations; Jacobs v. Miller, 253 Iowa 213, 218, 111 N.W.2d 673, 676; Kerr v. Chilton, 249 Iowa 1159, 1166, 91 N.W.2d 579, 584, and citations; 16 C. J. S., Constitutional Law, section 98b, pages 375, 376.

 A like rule fully applies in construing a provision of a state constitution. If fairly possible, it will be construed so it does not violate a provision of the federal constitution. 16 Am. Jur.2d, Constitutional Law, section 67, page 246, states: "* * * where a provision of a state constitution is capable of two constructions, one of which would be in conflict with the Federal Constitution, the other must be adopted." Under the construction we give section 37, Article III, of our own constitution there is no violation of the equal protection clause of Amendment 14.

IX. We next combine for consideration plaintiffs' contention single-member districts are required by section 6, Article I, of the state constitution and their third proposition the multi-member constituency apportionment scheme of the temporary reapportionment plan violates section 1, Amendment 14 to the federal constitution.

After Baker v. Carr, 369 U. S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663, was decided on March 26, 1962, the Supreme Court on June 15, 1964, decided Reynolds v. Sims, 377 U. S. 533, 84 S. Ct. 1362, 12 L. Ed.2d 506, furnishing guidelines for apportionment in state legislatures.

The same day the Supreme Court announced its decisions in the following cases: WMCA, Inc. v. Lomenzo, 377 U. S. 633, 84 S. Ct. 1418, 12 L. Ed.2d 568; Maryland Committee for Fair Representation v. Tawes, 377 U. S. 656, 84 S. Ct. 1429, 12 L. Ed.2d 595; Davis v. Mann, 377 U. S. 678, 84 S. Ct. 1441, 12 L. Ed.2d 609; Roman v. Sincock, 377 U. S. 695, 84 S. Ct. 1449, 12

L. Ed.2d 620; Lucas v. Forty-fourth Colorado General Assembly, 377 U. S. 713, 84 S. Ct. 1459, 12 L. Ed.2d 632. With Reynolds the cases deal with the states of Alabama, New York, Maryland, Virginia, Delaware and Colorado.

As a basic constitutional standard the equal protection clause requires seats in both houses of a bicameral state legislature be apportioned on a population basis. An individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the state. Reynolds v. Sims, 377 U. S. 533, 568, 84 S. Ct. 1362, 1385.

By holding as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the equal protection clause requires that a state make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement. Reynolds v. Sims, 377 U. S. 533, 577, 84 S. Ct. 1362, 1389, 1390.

We reject the contention that formation of single-member districts is necessarily required by either section 6, Article I, of the state constitution, or section 1, Amendment 14, to the federal constitution. See in support Reynolds v. Sims, supra; Lucas v. Forty-fourth Colorado General Assembly, supra, 377 U. S., at 731, n. 21, 84 S. Ct., at 1471, n. 21, where the court said, "We do not intimate that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective," and the following statement from Fortson v. Dorsey, 379 U. S. 433, 436, 85 S. Ct. 498, 500, 13 L. Ed.2d 401:

"Only last Term, in our opinion in Reynolds v. Sims, 377 U. S. 533, 84 S. Ct. 1362, 12 L. Ed.2d 506, decided after the decision below, we rejected the notion that equal protection necessarily requires the formation of single-member districts. In discussing the impact on bicameralism of the equal-protection standards, we said, 'One body could be composed of single-mem-

ber districts while the other could have *at least some* multimember districts', 377 U. S., at 577, 84 S. Ct., at 1389. Again, in holding that a state might legitimately desire to maintain the integrity of various political subdivisions, such as counties, we said: 'Single-member districts may be the rule in one State, while another state might desire to achieve some flexibility by creating multimember or floterial districts. *Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the state.*' 377 U. S., at 579, 84 S. Ct., at 1390."

The creation of multimember districts is not in itself a violation of either section 6, Article I, of the state constitution or section 1, Amendment 14, to the federal constitution. Fortson v. Dorsey and Reynolds v. Sims, both supra. However, we do recognize in a proper case there might be discrimination. Both Lucas and Fortson, supra, give recognition to some of the objections to multimember districts. It might well be that, designedly or otherwise, a multimember constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. A legislative scheme which creates single-member districts and multimember districts in an arbitrary manner would be objectionable. In the absence of any reasonable explanation or justification (historical or otherwise), such districting might be the result of gerrymandering for partisan advantage and, in that event, would be arbitrary and capricious. Butcher v. Bloom, 415 Pa. 438, 203 A.2d 556, 573.

In Lucas, supra, under the plan being considered by the court, each Denver voter was required to vote for 18 senators and 17 representatives. Ballots were long and cumbersome, and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies within the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them. Rather, each legislator elected from a multimember county represented the county as a whole.

The foregoing statements have been referred to in various opinions as "the objections" to multimember districts.

Appellants under their third proposition, after calling attention to the fact that the metropolitan Des Moines area extends across the Polk County line into Warren County, pose the follow questions: Is it equality that one person who works in the city of Des Moines can vote for 11 representatives and his neighbor because of the location of the house in which he lives can vote for only one? Is it equality that the person in Polk County can vote for five senators every four years and his neighbor in Jasper County can vote for only one? Is it equality to the citizens in Polk County that none of them has any single representative to whom he can look to represent his views in contrast to the neighbor in Warren County? On the other hand, is it equality that the neighbor in Warren County can only directly influence the vote of one representative or one senator whereas the Polk County citizen can directly influence the vote of 11 representatives and five senators?

The same contention was presented to the three-judge federal court in Davis v. Cameron, supra, 238 F. Supp., at 466, except Ringgold County was substituted for Warren County.

"Defendant Drake raises the additional issue that Senate File 1 is invalid because it creates two classes of representative and senatorial districts, that is, a single-member and multimember districts. He contends 'that under said plan, although the voters of a majority of the counties are permitted to vote for but one representative and to elect only one representative, a voter residing in Polk County is permitted to vote for and elect eleven representatives. Thus the vote for representation in the House of Representatives of a voter residing in Polk County is thus given eleven times the weight of a voter in Ringgold County. That a voter in Polk County is a constituent of and is represented by eleven representatives in the Iowa General Assembly, whereas a voter in Ringgold County is a constituent of and is represented by only one representative in the House of Representatives.' He makes similar claims with respect to variances between the single and multimember senatorial districts. In a recent decision the Supreme Court held that the creation of

multimember districts is not in itself a violation of the equal protection clause. Fortson v. Dorsey (1965), 85 S. Ct. 498. The Court recognized in a proper case discrimination might be claimed and in this respect stated as follows: " '* * * It might well be that, designedly or otherwise, a multimember constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster.' "

We fail to see the difference between the argument advanced by appellants in support of this contention and that advanced by Drake which we have quoted. The court in Cameron, supra, said: "Defendant Drake makes no such claim herein. We therefore hold the creation of multimember districts is not in itself invalid."

In written argument appellants quote extensively from Drew v. Scranton, 229 F. Supp. 310 (N. D. Pa. 1964), to support their contention. The court was considering Pennsylvania's representative reapportionment act which had set up a curious pattern of representative districts in the larger counties. In all counties entitled to two representatives, except Lebanon, single-member districts were created. Likewise, in cases of Lackawanna and York, entitled to four representatives, Berks, entitled to five, and Luzerne and Westmoreland, entitled to six, single-member districts were uniformly provided. But in the larger counties no such pattern was followed. Fourteen of the larger counties were entirely divided into single-member districts, while at the same time 15 other larger counties, many of them adjoining the single-member district counties, were divided into a crazy quilt of one, two, three and four-member districts. In the absence of any legislative history or other explanation justifying it, the court concluded on page 326 of 229 F. Supp., "this districting is either the result of gerrymandering for partisan advantage, as was suggested at the hearing, or it was wholly arbitrary and capricious."

The 1965 temporary plan is not a legislative scheme creating single-member districts and multimember districts in an

arbitrary manner or the result of gerrymandering for partisan advantage, nor is it arbitrary and capricious. It creates no such situation as was before the court in Drew v. Scranton, supra. Certainly the provision for multimember districts contained in the temporary plan has a legislative history justifying it.

The Iowa legislators, or at least a significant number of them, apparently took the position section 37 of the Iowa Constitution, which has remained in its present form since the Constitution of 1846, forbids subdistricting in Iowa. As pointed out in appellees' brief, the first apportionment in this state provided for multimember districts (Lee County had five representatives and two senators, Van Buren and Des Moines Counties each had four representatives and two senators). Section 37 was in force at that time as section 32. The legislature did not indulge in subdistricting then or at any subsequent time. Yet from 1846 to date some Iowa counties were entitled to multiple representatives. At no time has there been subdistricting. Historically, and on the basis of legal opinion available to them, the legislators who believed they were precluded from subdistricting were correct. It was their sworn duty to follow the constitution as written and as it remained after the federal court's condemnation of sections 34, 35 and 36.

Prior to this opinion the only authoritative legal interpretation of section 37 came from the three-judge federal court in Davis v. Synhorst, 217 F. Supp. 492, and 225 F. Supp. 689 (1964). Both cases clearly recognized that under the present Iowa Constitution subdistricting would be prohibited; neither opinion indicated in anyway such prohibition was or is repugnant to the United States Constitution. Today we have held section 37 does not prohibit subdistricting under the conditions set forth in Division VIII, supra.

This history dispels the reasons given by the three-judge federal court in Drew, supra, for its conclusions.

The 1965 temporary plan not only lacks the objections to which attention is called in Lucas and Fortson, both supra, as creating a proper case for claiming discrimination, but was an "honest and good faith effort to construct districts in both houses

of the legislature as nearly of equal population as practicable."
Reynolds v. Sims, supra.

While Drew v. Scranton, supra, was pending on appeal, the
Pennsylvania Supreme Court decided Butcher v. Bloom, 415 Pa.
438, 203 A.2d 556. The judgment in Drew v. Scranton was then
vacated by the United States Supreme Court.

Appellants further contend a system of at-large election of
senators and representatives results in block voting and discrimi-
nation against persons within Polk County who might have a
senator or representative elected to represent their views.

They assert subdistricting in Polk County would have guar-
anteed representation of the minority party in that county. As a
basis for such claim they show twenty-three contiguous westside
precincts, which include every precinct in Des Moines which has
any portion thereof lying west of Thirtieth Street to the west
limits and from the north city limits to the south city limits,
had 28 percent of the Polk County vote cast in the 1964 election
(registered Republicans in this area outnumber registered Demo-
crats by a margin of nearly two-to-one). In 1964 two Repub-
lican candidates for state representative received more votes in
these twenty-three contiguous westside precincts than any Demo-
cratic candidates, but no Republicans were elected in Polk. Said
differently, if there had been subdistricting in Polk County, it
is possible two Republicans would have been elected as state
representatives.

This same argument was urged in Stout v. Bottorff, 246 F.
Supp. 825, 829 (S. D. Ind. 1965). The court, reaching a conclu-
sion contrary to appellants' contention, said:

"We also see no merit in plaintiff Grills' attack on the 1965
Act for failure of the legislature to divide Marion County into
districts rather than making it a single, multimember district
electing members of the General Assembly at large. In support
of this claim that the Act thus deprives certain voters in Marion
County of equal representation Grills has submitted voting rec-
ords showing that in some past elections certain townships or
other areas of the county would have elected a candidate of the
minority party in that particular election if the county had been
subdistricted. We have been shown no evidence in these records

of any discrimination, purposeful or otherwise, against any group of voters in the at-large election system in Marion County, and in the absence of such a showing, Grills is not entitled to any relief on the basis of this claim." (Citing cases)

No citizen of Iowa as a result of the legislative scheme provided by the 1965 temporary plan has been deprived of his right to vote for the duly nominated candidate of the party of his choice and in the area in which he resides.

The burden of proving a legislative enactment to be violative of the constitution rests upon those so asserting to the degree of negativing every reasonable basis of support therefor. Faber v. Loveless, 249 Iowa 593, 597, 88 N.W.2d 112, 114, and citations; Davis v. Synhorst, 217 F. Supp., at 497.

Appellants' contentions considered in combination in this division cannot be sustained.

X. Under the second proposition relied on for reversal appellants contend there is a valid constitutional requirement today that the Iowa Senate be composed of 50 members. In support they urge section 34, Amendment of 1904, provided for a Senate of 50 members apportioned among the several counties or districts according to population, and it was the limitation that no county shall be entitled to more than one (1) senator, placed on this section by the Amendment of 1928, that led the three-judge federal court in Davis v. Synhorst, 217 F. Supp. 492, to declare this section unconstitutional as being invidiously discriminatory.

In the alternative, they urge sections 34, 35, 36 and 37 of Article III of the state constitution be declared inseparable and where portions of three of the provisions have been held federally unconstitutional, the remaining portion of these three provisions plus the fourth provision must also fall as an inseparable part of the apportionment scheme.

We do not agree with appellants' first contention under this proposition, nor can we accept their argument in the alternative. In Davis v. Synhorst, 225 F. Supp. 689, the federal court was correct when it said at page 692: "* * * It is the view of the court that Article III, sections 34, 35, and 36 of the Iowa Constitution which have as their object and purpose the estab-

lishment of a complete apportionment plan for the selection of members of both houses of the General Assembly are inseparable. Under the circumstances of this case it is our opinion that said sections in combination are inseparable." (Citing cases) We believe the statement is sound and adopt it here.

The Constitution of 1846 contained Article III, section 37, as it now exists as Article III, section 32. Article XII, section 7, designated the number of representatives for each county. Article III, section 31, set out the number of senators and representatives, how apportioned among the county and how often apportioned.

The 1857 Constitution retained section 37 as unchanged, whereas sections 34, 35 and 36 embodied a new plan of apportionment. Section 34 referred to senators and how they were to be apportioned and how often. Section 35 set out the number of senators and representatives; it set out a restriction on the number of counties in a representative district; it set out circumstances where a county or district would be entitled to one representative and when any county or district would be entitled to an extra representative; and it provided there would be no floating districts. Section 36 provided that in every legislative session a ratio would be fixed and legislative districts would be formed.

In 1904 a new reapportionment plan became law. The Amendments of 1904 repealed prior sections 34, 35 and 36 and adopted sections 34, 35 and 36 as set out in Division II, supra. Sections 34, 35 and 36 are a scheme of legislative reapportionment which is inseparable for, if section 35 is stricken, that which remains is incomplete and does not accomplish an effective scheme for the constituting of the Iowa legislature.

In 1904 the legislature and the people had before them a complete reapportionment plan with sections 34, 35 and 36 thereof interrelated and so connected with the whole Act that when section 35, which has been declared unconstitutional by the federal court, is stricken from such scheme, it is impossible to give full effect to what appears to have been the intent of the legislature.

Sections 34, 35 and 36 being inseparable, it follows there is

no valid constitutional requirement today that the Iowa Senate be composed of 50 members.

Where the Act is single as to its objective, or seeks to obtain a single object or purpose, then if part of the Act is unconstitutional, such part cannot be separated from the constitutional part if they are connected and dependent upon each other so that if you reject the unconstitutional part you destroy the legislative intent, then the whole Act must fall. Smith v. Thompson, 219 Iowa 888, 898, 258 N.W. 190, 196.

Where part of an amendment to a state constitution is invalid because it violates the Federal Constitution, if the several parts of the amendment are separable, the valid portions may be saved, unless it is obvious that the intent of the adopters of the amendment was to accept one general scheme in an entirety, in which event, if part of the amendment falls, the whole must fall with it. 16 Am. Jur.2d, Constitutional Law, section 42.

We agree with the view of the federal court as expressed in Davis v. Synhorst, 225 F. Supp. 689, 692, that section 37 is not an inseparable feature of the constitutional apportionment provisions. It does not conflict with the requirements of **equal** protection of the laws required by the state and federal constitutions under the interpretation we have given to such section in Division VIII, supra, and thus remains a part of our constitution.

XI. The trial court, as a matter of declaratory judgment requested in defendants' counterclaim, approved the 1965 temporary apportionment plan as a constitutional interim plan of apportionment. While Senate File 568, chapter 88, Laws of the Sixty-first General Assembly of Iowa (1965 temporary apportionment plan), contains objections to both state and federal standards required for equal protection as disclosed by the record in Polk County, the only multimember district before us in this case, it is sufficient to serve as an interim plan of apportionment. Reference will be made to these objections later in this opinion. We now hold that members of the Sixty-second General Assembly of Iowa be elected at the 1966 election in accordance with its terms and provisions.

XII. We do not believe the creation of multimember dis-

tricts, of itself, would violate either the state or federal constitution simply because the voters in a particular district (where justified by population) would vote for two or more representatives while those in another district would vote for a lesser number. However, we do believe where the objections to multimember districts as set out in Lucas, Fortson and Drew cases, supra, are found to exist to the point where there is invidious discrimination leading to the conclusion that equal protection rights are violated, a plan of apportionment able to withstand constitutional attack would be more readily accomplished by subdistricting in those instances.

XIII. The record indicates many of the same objections contained in Lucas, Fortson and Drew, supra, existed in the 1964 Polk County election and will probably continue to exist there unless we direct subdistricting in that county.

In the 1964 primary election the voter wishing to vote the Democratic ticket was confronted with a ballot containing the names of 33 candidates seeking the 11 nominations for state representative from that county; for state senator, there were two candidates for the four-year term and two for the one-year term. The voter desiring to vote in the Republican primary was confronted with a ballot containing the names of 14 candidates seeking the 11 nominations of that party.

At the 1964 general elections a voter was confronted with a ballot containing the names of 22 candidates seeking the 11 vacancies for state representative; one candidate on each ticket for state senator for the two-year term and one on each ticket for the four-year term; in addition there were the Conservative party's candidates.

The ballots were long and cumbersome and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies within the county resulted and residents of the various areas had no single member of the House or Senate elected specifically to represent them. Rather, each legislator elected from Polk County represented the county as a whole. When a citizen is faced with the task of selecting 11 representatives, as he was in Polk County, there is a serious question as to whether he discriminates among the

various candidates in order to make a judgment of the candidate's qualifications. It places a severe strain on the voter's capacity.

While we hold the 1965 temporary reapportionment plan is sufficient for the 1966 elections, this record leads us to the conclusion that in order to provide equal protection of the laws subdistricting is necessary in Polk County thereafter. The constitutional provisions determined in Division IX, supra, apply to all multimember districts where invidious discrimination exists leading to the conclusion that equal protection rights are violated, and are not limited to Polk County.

It is our opinion that a special session of the legislature is not necessary to accomplish this objective. The Sixty-second General Assembly of Iowa will have the power to and is the appropriate body to provide such subdistricting.

Reapportionment is primarily a matter for legislative consideration and determination, and judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so. Reynolds v. Sims, supra, 377 U. S., at 586, 84 S. Ct., at 1394.

The decided cases, almost without exception, recognize that state instrumentalities should be afforded a reasonable opportunity to reapportion themselves along constitutional lines. Davis v. Synhorst, supra, 217 F. Supp., at 505.

Progress has been made by the legislature since the decision in the first of the four federal cases involving reapportionment in Iowa, and we have every reason to believe the next session of the General Assembly of Iowa will promptly enact such legislation.

The Iowa legislature must approach their assignment with the understanding they are to create districts for each legislative branch which are as nearly equal in population as is practicable. This is the basic concept. We repeat, mathematical exactness or precision is hardly a workable constitutional requirement. Reynolds v. Sims, supra, 377 U. S., at 577, 84 S. Ct., at 1390. We do not attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating

from apportionment according to population. It is neither practicable nor desirable to establish rigid mathematical standards. Rather, the proper judicial approach is to ascertain whether there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination. Roman v. Sincock, supra, 377 U. S., at 710, 84 S. Ct., at 1458.

For a discussion as to the population variances considered in Reynolds v. Sims, supra, and other companion cases of the same day, we refer to Davis v. Cameron, supra, 238 F. Supp., at 464.

We also refer to the four federal cases from the southern district of Iowa as well as Honsey v. Donovan, 236 F. Supp. 8 (D. C. D. Minn. 4th Div., December 4, 1964), for some additional legislative guidelines.

We retain jurisdiction to consider prescribing an interim plan of reapportionment providing for subdistricting in Polk County in the event it becomes apparent that no substantial progress is being made by the Sixty-second General Assembly to provide such subdistricting.

To summarize the foregoing opinion:

1. The equal protection clause of the state and federal constitutions requires substantially equal legislative representation for all citizens of a state. This is the basic concept.

2. The 1965 temporary apportionment plan contains objections to both state and federal standards required for equal protection as disclosed by the record in Polk County, the only multimember district before us in this case.

3. Subdistricting is required in Polk County after the 1966 elections.

4. A special session of the Sixty-first General Assembly is not required to accomplish this objective.

5. The 1965 temporary reapportionment plan is sufficient to serve as an interim plan of apportionment.

6. Members of the Sixty-second General Assembly are to be elected in accordance with the terms and provisions of Senate

File 568, chapter 88, Laws of the Sixty-first General Assembly of Iowa (1965 temporary apportionment plan).

7. The Sixty-second General Assembly of Iowa will have the power to and is the appropriate body to provide such subdistricting.

▆▆▆ 8. The equal protection clause requires that a state make an honest and good faith effort to construct districts, in both houses of the legislature, as nearly of equal population as is practicable.

9. But mathematical exactness or precision is hardly a workable constitutional requirement. And it is neither practicable nor desirable to establish rigid mathematical standards. Rather, the proper judicial approach is to ascertain whether there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination.

▆▆▆ 10. So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible.

11. Universal equality is not the test; there is room for other considerations.

▆▆▆ 12. The burden of proving a legislative enactment to be violative of the constitution rests upon those so asserting to the degree of negativing every reasonable basis of support therefor.

13. Jurisdiction of the court in this case is retained.

XIV. Defendants' motion to strike matters from appellants' brief ordered submitted with this appeal is overruled.

Costs are taxed one third to plaintiffs and two thirds to defendants.

Affirmed in part and reversed in part.

STUART, J.—We cannot agree with Divisions IX and XII of the principal opinion by JUSTICE MASON. It follows that we must also take exception to certain statements contained in

Division XIII related thereto. As a majority of the court favors the view expressed herein, Divisions IXA and IXB, which follow, replace Division IX in the principal opinion as the opinion of the court on the issues therein discussed.

IXA. Appellants contend the 1965 temporary reapportionment plan which includes both multimember and single-member districts in each house of the legislature violates Article I, section 6, of the Bill of Rights of the Constitution of the State of Iowa, which provides:

"All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."

The citizens whose rights are at issue here are divided into two classes: (1) Those who reside in single-member districts and (2) those who reside in multimember districts. We must examine the temporary plan to determine if it has equal operation between these two classes and whether one class has privileges and immunities not available to the other.

The problem facing us here is well illustrated by the situation which exists in metropolitan Des Moines. Residential areas to the south of Des Moines extend into Warren County. A person on the south side of the road, living in Warren County, can vote for only one senator and one representative. His neighbor across the road to the north, living in Polk County, can vote for five senators and eleven representatives. The resident of Warren County can vote for $\frac{1}{61}$ of the senate and $\frac{1}{124}$ of the house. The resident of Polk County can vote for $\frac{1}{12}$ of the senate and $\frac{1}{11}$ of the house.

The mere statement of this example discloses the basic unfairness, inequality and lack of uniformity inherent in such a scheme of legislative apportionment. The inequalities are not just theoretical. Equal voting power for all citizens is the goal. Proposed legislation requires a majority vote of the members of each house to become a law. It is a political reality that legislators are much more inclined to listen to and support a constituent than an outsider with the same problem. It is equally basic that much legislative work is done by committees and there is a

distinct advantage in having one's own representative sitting as a member of a committee considering legislation in which one has an interest. A resident of Polk County has $\frac{1}{12}$ of the senate and $\frac{1}{11}$ of the house which will listen to his problems with a sympathetic ear. A resident of Warren County can expect the same attention from only $\frac{1}{61}$ of the senate and $\frac{1}{124}$ of the house. Particularly in personal interest legislation the resident of Polk County has an unfair and unequal advantage over the resident of Warren County or of any other single-member district. He has a much greater opportunity to find legislators to espouse his cause and a much greater chance that one or more of his representatives will be on the committee to which his legislation is assigned. His voting power is much greater.

Any scheme of legislative apportionment in which there are multimember districts and single-member districts in the same house impairs the right of a resident of a single-member district to have the laws operate uniformly as guaranteed by section 6, Article I, of the Constitution of Iowa. Such impairment violates his constitutional rights unless it can be shown such peculiar circumstances exist that a rational plan of apportionment cannot be achieved by using all single-member districts We do not foreclose the possibility that in some instances there may be legitimate considerations which would make some multimember districts constitutionally permissible.

IXB. Appellants also argue this temporary plan violates the Equal Protection Clause of Amendment 14 to the Constitution of the United States.

The Supreme Court has clearly indicated that perfect equality among voters would require that each citizen's vote be of the same weight and effect as the vote of every other citizen. Any plan of representation which deviates sufficiently from that goal is said to be "invidiously discriminatory" and to violate the Equal Protection Clause of Amendment 14 to the United States Constitution. In Gray v. Sanders (March 1963), 372 U. S. 368, 379–381, 9 L. Ed.2d 821, 83 S. Ct. 801, 808, Mr. Justice Douglas, speaking for the majority of the court, said: "The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic

qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions. * * * The conception of political equality from the Declaration of Independence to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth and Nineteenth Amendments can mean only one thing—one person, one vote."

In Reynolds v. Sims (June 15, 1964), 377 U. S. 533, 576, 84 S. Ct. 1362, 1389, 12 L. Ed.2d 506, 535, and five other cases handed down the same date, the Supreme Court applied the principles set forth in Gray v. Sanders to the apportionment of state legislatures and concluded "that the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis." The court recognized the impossibility of "mathematical exactness and precision" and stated: "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature" (377 U. S. 579, 12 L. Ed.2d 537).

However, as pointed out in the dissent of Justice Harlan, in Reynolds v. Sims, 377 U. S. 622, 12 L. Ed.2d 562, the six cases filed June 15, 1964, ruled out as legitimate considerations "(1) history; (2) 'economic or other sorts of group interests'; (3) area; (4) geographical considerations; (5) a desire 'to insure effective representation for sparsely settled areas'; (6) 'availability of access of citizens to their representatives'; (7) theories of bicameralism (except those approved by the court); (8) occupation; (9) 'an attempt to balance urban and rural power'; (10) the preference of a majority of voters in the state."

The only two "legitimate considerations" suggested are a "[legislative] desire to maintain the integrity of various political sub-divisions, insofar as possible", Reynolds v. Sims, 377 U. S. 578, 12 L. Ed.2d 537, and a "reasonable plan for periodic revision of their apportionment schemes". Supra, page 583, and 12 L. Ed.2d 539.

1150

 We must apply these principles to the factual situation set out in IXA relating to Article I, section 6, of the Constitution of Iowa. Is Equal Protection afforded when one citizen votes for $\frac{1}{61}$ of the senate and $\frac{1}{124}$ of the house and another citizen votes for $\frac{1}{12}$ of the senate and $\frac{1}{11}$ of the house? We do not believe it is.

The appellees rely on Davis v. Cameron, 238 F. Supp. 462, 466; Reynolds v. Sims, 377 U. S. 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506; Lucas v. Forty-fourth Colorado General Assembly, 377 U. S. 713, 84 S. Ct. 1459, 12 L. Ed.2d 632; and Fortson v. Dorsey, 379 U. S. 433, 85 S. Ct. 498, 13 L. Ed.2d 401.

In Davis v. Cameron, supra, appellant's argument here was presented to the three-judge federal court in Iowa. It was rejected without analysis, discussion or explanation on the authority of Fortson v. Dorsey, supra.

In Fortson v. Dorsey, supra, at page 440 of 379 U. S., 502 of 85 S. Ct., 406 of 13 L. Ed.2d, the legislative scheme in question divided some counties into districts and provided: " 'Each Senator must be a resident of his own Senatorial District and shall be elected by the voters of his own district, except that the Senators from those Senatorial Districts consisting of less than one county shall be elected by all the voters of the county in which such Senatorial District is located.' "

The case considered only whether the rights of the residents of the multidistrict counties were protected. It was claimed the scheme was defective because countywide voting in multidistrict counties could thrust upon the voters of a district a senator for whom no one in the district had voted. This argument was rejected although the court recognized a multimember district might in a particular instance violate the Equal Protection Clause. As all voters within the district had equal voting rights, any denial of equal protection must necessarily have depended on the facts. The argument before us here was not considered.

In Fortson v. Dorsey, the court cited as authority the dictum from Reynolds v. Sims set forth in the majority opinion. These statements have been classified as "rather casual dictum" (63 Mich. L. R. 219, December 1964). The problem confronting

us here was not before the court at that time. Arguments advanced here were not considered.

In Lucas v. Forty-fourth Colorado General Assembly, supra, the Supreme Court pointed out the undesirable features of a multimember district as it affected the residents of the district. There was no argument made as to the effect on citizens of single-member districts.

Although these cases intimate that the combination of multi-member and single-member districts does not violate the Equal Protection Clause, they have not considered the problem from the standpoint of the resident of a single-member district. The court has never viewed the problem in the light of the one man-one vote concept. No one has ever explained why a scheme which seems to be a patent violation of the one man-one vote concept does not offend the Equal Protection Clause. In view of the deep concern the Supreme Court has repeatedly shown for the rights of the individual and for ultimate fairness, we believe it will hold such scheme violates the Equal Protection Clause when the argument here advanced is presented. Consistent application of the principles announced in Reynolds v. Sims seems to compel that result.

The Supreme Court said in Gray v. Sanders, 372 U. S. 368, 379, 83 S. Ct. 801, 808, 9 L. Ed.2d 821, 829: "How then can one person be given twice or 10 times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment."

It is just as unconstitutional for a person residing in an urban area to have 11 times the voting power of a person residing in a rural area as it is to have the voting power reversed.

The one man-one vote principle, as it applies to legislatures, is thoroughly explored by MR. CHIEF JUSTICE WARREN in Reynolds v. Sims. Many of his statements contained therein are par-

ticularly applicable to this situation. The page references are to 12 L. Ed.2d:

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" (pages 523, 524).

"A predominant consideration in determining whether a State's legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature" (page 527).

"And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. *It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once.* And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable" (pages 527, 528). (Emphasis added.)

"Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable" (page 528).

"And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. * * * Since the achieving of fair and effective representation for all citizens is concededly

the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, * * *" (pages 529, 530).

"However complicated or sophisticated an apportionment scheme might be, it cannot, consistent with the Equal Protection Clause, result in a significant undervaluation of the weight of the votes of certain of a State's citizens merely because of where they happen to reside." WMCA, Inc. v. Lomenzo, 377 U. S. 633, 653, 84 S. Ct. 1418, 1428, 12 L. Ed.2d 568, 580.

Attention could be called to many other similar statements but those set out indicate the thinking of the Supreme Court and the application here is obvious.

Argument has been made that the voter in a single-member district has a greater influence with his one legislator who may only have 30,000 constituents than a voter with eleven legislators who have 300,000 constituents. Assuming this is true for the purpose of argument, it only offers evidence of a factor to consider in determining whether residents within the multimember district are also denied equal protection of the laws. We know of no rule whereby the denial of equal protection to one class for one reason can be set off against the denial of equal protection to another class for a different reason in such a manner as to make an apportionment plan constitutional.

Argument is also advanced that equal protection is accomplished because in Polk County approximately $\frac{1}{12}$ of the population votes for $\frac{1}{12}$ of the legislature and in Warren County approximately $\frac{1}{120}$ of the population votes for $\frac{1}{120}$ of the house and in Warren and Marion Counties $\frac{1}{60}$ of the population votes for $\frac{1}{60}$ of the senate. Such an arrangement may meet the population limitations of equal protection but it certainly does not protect the rights of the individual who is the primary beneficiary of the Equal Protection Clause. One twelfth or $\frac{1}{120}$ of the population has no definable or recognizable rights, privileges, opinions or positions as such. It is the individual within the

fraction of the population who is entitled to protection. This is not achieved by lumping him in with 299,999 other people. This is not one man-one vote. "A citizen's constitutional rights can hardly be infringed simply because a majority [or $\frac{1}{12}$] of the people choose [to do so]." Lucas v. Forty-fourth Colorado General Assembly, 377 U. S. 713, 736, 84 S. Ct. 1459, 1474, 12 L. Ed.2d 632, 647.

A point is made of the fact that historically the Iowa legislature has had multimember districts. This is true. We have not, heretofore, been called upon to pass on their constitutionality. As long as Iowa was basically an agricultural state there was no problem. The need to reapportion our legislature developed out of the industrialization and farm mechanization which have occurred in the last 30 years. During that period the constitution has not permitted more than two-member districts. No county has been allowed more than one senator.

Attention has been concentrated on multimember districts and districts of unequal population since the United States Supreme Court's one man-one vote decisions. Prior to those decisions, it was thought the states had a right to consider factors other than population in apportioning their legislatures. Now the "legitimate considerations" are quite restricted. Equal application of the one man-one vote concept limits the legislature's right to establish multimember districts to the same extent it is prohibited from departing from the equal population requirement by the Supreme Court decisions.

Only in Pennsylvania has the one man-one vote argument been considered by the courts. In Drew v. Scranton, 229 F. Supp. 310, 326, a special three-judge court considering the apportionment plan for Pennsylvania was confronted with a "haphazard arrangement of two, three and four-member districts alongside of single-member districts". The court said: "we think that invidious discrimination in voting power results when, as in the case before us, some Pennsylvania voters may by reason of the arrangement of legislative districts vote for two, three or even four representatives, while others are restricted to voting for one only. Certainly a voter in a four-member district will not only have four votes for representative, but he will also have

four members of the House who will be especially concerned with his views and interests and amenable to his persuasion, since they will want the benefit of his suffrage for reelection. The voter in a single-member district, however, will have only one representative to look to to express his views and espouse his interests. We are, of course, not dealing here with a case where all the representatives are elected at large, so that each voter has the same number of votes as every other voter, or with a situation where the districts all elect the same number of members, whether two or more. Those situations do not violate the principle of one man-one vote. But we think that this principle means what it says. It does not mean, for example, in Allegheny County one man-one vote in McKeesport, two votes in Clairton, three votes in Wilkinsburg and four votes in Sewickley, which the statute under consideration authorizes."

They held "that the provisions of the representative apportionment act for multimember districts in certain parts of certain counties deny to the voters in single-member districts of those and other counties the equal protection of the laws by depriving them of voting power equal to that of the voters of the multimember districts" (page 328 of 229 F. Supp.). The Supreme Court vacated this judgment for other reasons.

In Butcher v. Bloom (September 1964), 415 Pa. 438, 468, 203 A.2d 556, 573, the Supreme Court of Pennsylvania in setting guidelines for the legislature considered "it would be more prudent to approach the matter of apportionment by setting up single-member districts unless valid and compelling reasons exist which require the creation of some multimember districts" but did not believe multimember districts and single-member districts combined violated the Federal Constitution. However, for the reasons set out above, we believe single-member districts are as essential to the protection of an individual's rights under the Equal Protection Clause as are equally populated districts.

If the Equal Protection Clause is violated when certain representatives are given an unequal number of constituents, the converse is also true. The Equal Protection Clause is

violated if certain constituents are given an unequal number of representatives.

The Supreme Court recognized in Reynolds v. Sims, supra, that mathematical precision was not a workable constitutional requirement. It there said, page 579 of 377 U. S., 1391 of 84 S. Ct., page 537 of 12 L. Ed.2d: "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal population principle are constitutionally permissible." The same legitimate considerations which would make multimember districts constitutionally permissible under the Iowa Constitution apply here. We believe it difficult, if not impossible, however, to justify constitutionally, a multimember district in which the ratio of members therein to a single-member district exceeds the variance in population between districts which has been approved by the United States Supreme Court.

We therefore hold that the 1965 temporary reapportionment plan violates section 6, Article I, of the Constitution of Iowa and Amendment 14 to the Constitution of the United States.

XII. We do not agree with Division XII of the principal opinion and would eliminate it.

XIII. We agree with that portion of Division XIII of the principal opinion which holds the 1965 temporary plan denies equal protection to the residents of Polk County. We also agree the legislature should be given further opportunity to work out a constitutional apportionment plan and jurisdiction should be retained in the event it is unable to do so.

Because the determination of constitutional principles in Division IX of JUSTICE MASON's opinion differs from our determination in IXA and IXB, we believe it necessary to make it clear these Divisions also apply to all multimember districts and are not limited to Polk County.

We also believe the reasons for deciding to permit an election under the 1965 temporary plan should be amplified. It would be most difficult for the Sixty-first General Assembly to meet and formulate a plan in time for the primary elections to be held this year. Special elections would have to be called to

fill vacancies. There is a possibility this decision will be appealed to the Supreme Court, which would require a stay. The Sixty-first General Assembly has the same constitutional deficiencies determined by this decision to exist in the 1965 temporary plan. In addition to this fact, it does not conform as closely to the population requirement as the 1965 temporary plan.

The United States Supreme Court has recognized the difficulty presented in such situations. In Reynolds v. Sims, supra, the court said at page 585 of 377 U. S.: "In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely on general equitable principles." The lower courts were directed to determine the equities in each situation in WMCA, Inc. v. Lomenzo, Roman v. Sincock, and Lucas v. Forty-fourth Colorado General Assembly, all supra. As a matter of equity and in light of all the circumstances set forth above, we conclude orderly reapportionment can best be accomplished by permitting the Sixty-second General Assembly to be elected under the 1965 temporary reapportionment plan set forth in chapter 88, Laws of the Sixty-first General Assembly.

We also disagree with statements in the summary contained in Division XIII which are in conflict with this opinion.

We reverse the trial court for the reasons expressed in Divisions IXA and IXB as well as for the reasons expressed in the principal opinion.

LARSON, J. (concurring specially)—I am unable to agree with the majority conclusion in Division X that sections 34, 35 and 36, of Article III, of the state constitution are inseparable, and that there is no valid constitutional requirement today that the Iowa Senate be composed of 50 members.

I agree that the rules of construction and interpretation applicable to statutes on separability also apply to constitutional questions. State ex rel. Johnson v. Chicago, B. & Q. R. Co., 195 Mo. 228, 93 S.W. 784. But I do not agree that the federal court

holding in Davis v. Synhorst, 217 F. Supp. 492, that these sections were inseparable was necessary or correct.

As I understand the generally-acknowledged rules. applicable to separability, the courts are reluctant and slow to declare an entire Act of the legislature unconstitutional if for some reason a part thereof is invalid and violence to the general intent will not be done by such a severance. In other words, the court must, if possible, save the good and only eliminate the bad, if the good can stand by itself. This rule the majority seems to recognize by the reference to 16 Am. Jur.2d, Constitutional Law, section 42, but there again this authority clearly states, "unless it is obvious that the intent of the adopters of the amendment was to accept one general scheme in an entirety", the valid portions may be saved. I would hold sections 34 and 35 of the 1904 amendment are separable, that on its face it is not obvious the adopters thereof intended all or none of the amendment be accepted, and that section 34 complied perfectly with the requirements of the Equal Protection Clause of the federal constitution, as well as Article I, section 6, of the state constitution, for the upper house of a bicameral state legislature. It is obvious the adopters desired that each house thereafter be considered separately, not as it had been under the 1846 Constitution where a single section, 31, set out both the number of senators and representatives to be chosen and provided how they were to be apportioned in both houses.

I think it is significant here that the apportionment and number in each house were dealt with separately. There is not the slightest hint that the apportionment in one house is dependent upon or reflected in the other. Section 34 of the 1904 amendment provided: "The senate shall be composed of fifty members to be elected from the several senatorial districts, established by law and at the next session of the general assembly held following the taking of the state and national census, they shall be apportioned among the several counties or districts of the state, according to population as shown by the last preceding census." Proponents of change would be hard pressed to draw, even today, a provision for the senate that would better conform to the requirements of the federal constitution as construed by the federal courts.

Admittedly, section 35 of the 1904 amendment was bad and, as section 36 is inseparable with it, both must fall. Section 35 dealt with the apportionment of the house alone and thus can be stricken without doing violence to the adopters' intent as to the senate. As bearing on this question, see comments in Lucas v. Forty-fourth Colorado General Assembly, 377 U. S. 713, 734, 84 S. Ct. 1459, 1472, 12 L. Ed.2d 632, 646, where the question of severability was considered and the court's position was announced in Maryland Committee v. Tawes, 377 U. S. 673, 12 L. Ed.2d 606. The court said it would have to consider the constitutionality of the apportionment plan as a whole where deviations from a strict population basis existed. If the scheme allowed a slight deviation in both houses so that they might be accumulative to the disadvantage of certain areas, then the *whole* plan might fail. Obviously such a situation would not result from the 1904 amendment adopted in Iowa, since section 34 is based solely on population. I, therefore, would hold the provisions of section 34 must be allowed to stand.

Such a decision would, of course, produce a conflict with the temporary plan used in the previous election and contemplated for 1966, where 57 senate seats are involved. This might be a logical basis to require a special session of the legislature before the 1966 election. However, due to the shortness of time and the history of this litigation, I am satisfied the temporary plan should be followed for the 1966 election but no further, and that the provision of section 34 fixing the number of senators at 50, and providing for their method of election, should be followed thereafter until altered by a proper constitutional amendment.

I have said nothing about the 1928 amendment which obviously made section 34 bad. As the three sections then stood, they were all invidiously discriminatory and the federal court should have so determined the issue on that basis. However, we can and should strike the 1928 amendment to section 34 which provided, "but no county shall be entitled to more than one (1) senator", as in conflict with Article I, section 6, and with the Federal Equal Protection Clause. This would permit section 34, Article III, of the state constitution, as adopted in 1904, to

stand, and require only a new plan of apportionment for the house in this state. I would so hold.