Lyle E. ADAMS, Richard P. Canella, James L. Cook, JoAnn P. Dickinson, Mary E. Jenkins, John A. Keenan, Barbara E. Mansheim, and Rosma J. Stigall, Individually and/or Representative of a Class of Voters in the Fort Madison Community School District, Plaintiffs-Appellants,

v.

The FORT MADISON COMMUNITY SCHOOL DISTRICT IN the COUNTIES OF LEE, DES MOINES, AND HENRY, in the State of Iowa, and the Board of Directors Thereof, Defendants-Appellees.

No. 54061.

Supreme Court of Iowa.

Dec. 15, 1970.

---

1. The writer is the only member of the court who feels the case might well have been submitted for jury determination.

Pollard, Deitchler, Thomas & Lawse, Fort Madison, for plaintiffs-appellants.

Fehseke & Fehseke, Fort Madison, for defendants-appellees.

Marvin R. Adams, Des Moines, Richard C. Bauerle, Ottumwa, Richard C. Turner, Atty. Gen., and Elizabeth A. Nolan, Asst. Atty. Gen., amici curiae.

UHLENHOPP, Justice.

The question before us is whether the legislature can constitutionally require an extra majority vote in order for bond proposals to carry.

In a bond election in the Fort Madison Community School District, 53.1% of those voting voted "yes." At least a 60% affirmative vote is required by Code, 1966, §§ 296.6, 75.1. Several voters who voted "yes" bring this suit challenging those statutes.

In 1963, the United States Supreme Court announced the principle of one person, one vote in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821. This court has consistently applied that principle in accordance with the spirit of the Gray decision. Kruidenier v. McCulloch, 257 Iowa 1315, 136 N.W.2d 546; Kruidenier v. McCulloch, 258 Iowa 1121, 142 N.W.2d 355, cert. denied, 385 U.S. 851, 87 S.Ct. 79, 17 L.Ed.2d 80; Meyer v. Campbell, 260 Iowa 1346, 152 N.W.2d 617; Mandicino v. Kelly, 158 N.W.2d 754 (Iowa); Gradischnig v. Polk County, 164 N.W.2d 104 (Iowa); In the Matter of Legislative Districting of General Assembly of Iowa, 175 N.W.2d 20 (Iowa).

Several courts have dealt with various extra majority requirements since the one person, one vote principle was announced. Rimarcik v. Johansen, D.C., 310 F.Supp. 61 (three-judge court) (55% requirement to adopt home rule charter—invalidated); Brenner v. School District of Kansas City, D.C., 315 F.Supp. 627 (three-judge court) (two-thirds for school bonds—upheld); Westbrook v. Mihaly, 2 Cal.3d 765, 87 Cal. Rptr. 839, 471 P.2d 487 (two-thirds for bonds—invalidated); Bogert v. Kinzer, 93 Idaho 515, 465 P.2d 639 (two-thirds for bonds—upheld); Lance v. Board of Education of Roane, 170 S.E.2d 783 (W.Va.) (three-fifths for bonds—invalidated).

Three main problems are presented by the voting statutes which are now before us: (1) What is the effect of the challenged statutes upon the voting strength of the "yes" and the "no" votes? (2) Is the simple majority rule invariable in a democracy? and (3) Does justification appear here for departing from the simple majority rule?

I. *Strength of "Yes" and "No" Votes.* The first problem requires consideration, initially, of the voting decisions of the United States Supreme Court, and then of the actual effect of the challenged statutes upon the "yes" and "no" votes.

**134**

The United States Supreme Court has held that citizenship, residence, and age requirements may be imposed for voting, but the voting power of an individual voter or group of voters may not be cut down or eliminated by such irrelevant factors as *geographical location of the voters,* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821; Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481; Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; WMCA v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; Lucas v. Colorado General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; Hill v. Davis, 378 U.S. 565, 84 S.Ct. 1918, 12 L.Ed.2d 1037; Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376; Swann v. Adams, 385 U.S. 440, 87 S. Ct. 569, 17 L.Ed.2d 501; Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L. Ed.2d 45; Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519, reh. denied, 395 U.S. 917, 89 S.Ct. 1737, 23 L.Ed. 2d 231; Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535; Hadley v. Junior College District of Kansas City, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (U.S.); *military service,* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675; *payment of a tax,* Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169; or *ownership of property or parentage of school children,* Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647. See also Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477; Fortson v. Morris, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330, reh. denied, 385 U.S. 1021, 87 S.Ct. 719, 17 L.Ed.2d 560; Sailors v. Board of Education of Kent County, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650; Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656; City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (U.S.).

The challenged statutes do not cut down or eliminate voting strength in any of the ways proscribed by those decisions. In Iowa the qualifications for voting in school elections are the same as in general elections. Code, 1966, § 277.12. Every citizen of the United States may vote who is aged 21 years and has resided in the state six months and in the county 60 days. Iowa Const. art. II, § 1; U.S.Const. Amend. XIX. The vote on bond issues is canvassed and declared for the school district as a whole. Code, §§ 277.19, 277.20. Thus each voter casting a ballot at any place in the district is tallied as one vote.

Nevertheless, 41 "no" voters can prevent adoption of a proposition by 59 "yes" voters. As stated in Note, 70 Columbia Law Review 486, 496 n. 60:

"The discrimination inherent in geographical vote-weighting is different from that of extraordinary majority requirements. The *Reapportionment Decisions* 'involved problems of discrimination against individuals * * * in the right of franchise based on the chance of geography.' * * * The same statement can be made of *Gray.* And these problems arose from the classification of voters, *in advance of voting,* by the place of their residence. The effect of this classification in *Gray* was that different weights were assigned to the different votes *depending upon the identity of the person who cast them.* The effect in the *Reapportionment Decisions* was that the per capita legislative representation of voters throughout the state varied with the place of residence of the voters being represented. * * *

"Despite these distinctions, however, it seems clear that a requirement for a three-fifths majority places those individual voters favoring the measure in an unfavorable position as compared to those who are opposed to it. And this unfavorable

position is not totally unlikely [*sic*] the position of those individual voters in the disfavored counties in the statewide elections in *Gray*."

The conclusion must be that under the statutes before the court the voting power of the "no" voters is not in proportion to their number, compared with the "yes" voters.

II. *Simple Majority Rule.* Implicit in the statement that the "no" voters have disproportionate power, however, is the assumption that the simple majority rule is to be invariably applied as the yardstick of the outcome of elections. Thus the contention of the "yes" voters is predicated on two interrelated postulates: each voter must be tallied as one, and the simple majority rule must be applied to determine the outcome—the side which gets 50% plus one vote must always win. Since voting on bond issues in Iowa is at large and each voter is tallied as one, the first postulate is met. The question, then, is whether the simple majority rule must be invariably applied.

Is rule by simple majority invariable in a democracy? Some think it is. As stated by Drury and Titus, in Legislative Reapportionment in Kansas: 1960, 9–10 (1960), "Democratic theory rests on the assumption that the people are sovereign. From this fundamental tenet arise two corollary postulates of democracy. The first is that each person in the commonwealth is to count for one, and no more than one. *This is the principle of numerical equality.* The second is that decisions are reached by counting each person as one to determine which policies are sanctioned by the greater number of people. *This is the principle of majority rule.*" (Italics added.) Professor de Grazia refers to this as the "egalitarian-majoritarian view." Apportionment and Representative Government, 36 (1963). But compare State ex rel. Witt v. State Canvassing Board, 78 N.M. 682, 437 P.2d 143 (involving both elements— each vote required to count as one but extra majority provision applied to determine outcome of election).

Simple majority rule is clearly a basic tenet of our system. It is the basis on which Congress functions. Rules and Manual, U. S. Senate, § 741.13 (1967); Rules and Practice, U. S. House of Representatives, § 508 (91st Cong. 1969). It is spelled out in the organic law of Iowa. The Iowa Constitution is amendable by simple majority vote of the members of both chambers of the General Assembly and of the voters. Iowa Const. art. X, § 1. Laws pass the General Assembly by simple majority vote of the members of the two chambers. Art. III, § 17. Majority rule has been acknowledged generally in the case law. 29 C.J.S. Elections § 242, p. 674; 26 Am.Jur.2d, Elections, § 309, pp. 134–35. It is recognized by the writers. I Bryce, Modern Democracies, 20–22 (1929); Commager, Majority Rule and Minority Rights, chs. I, III (1943); Ranney and Kendall, Democracy and the American Party System, 29–39 (1956); Thorson, The Logic of Democracy, 161–63 (1962); Mayo, Introduction to Democratic Theory, 169–74 (1960) (history of majoritarianism). Majority rule is the basis on which assemblages function. Robert's Rules of Order, 202 (1951) ("more than half the votes cast, ignoring blanks, at a legal meeting where a quorum is present"). Rule by majority was articulated by Jefferson in the early days of the Republic (although not without recognition of minority "rights"): "All, too, will bear in mind this sacred principle, that though the will of the majority is in all cases to prevail, that will to be rightful must be reasonable; that the minority possesses their equal rights, which equal law must protect, and to violate would be oppression." Jefferson, First Inaugural Address, from I Richardson, Messages and Papers of the Presidents, 1789–1897, 322 (1897). Majoritarianism underlay Lincoln's dictum, "Unanimity is impossible; the rule of the minority, as a permanent arrangement, is wholly inadmissible; so that, rejecting the

majority principle, anarchy or despotism in some form is all that is left." Lincoln, First Inaugural Address, from VI Richardson, supra, 9. Indeed, "democracy" is defined as "government by the people: rule of the majority". Webster's Third New International Dictionary (1961).

But even staunch majoritarians do not say majority rule is absolute. " * * * no one has ever advocated, and no one except its enemies has ever defined democracy to mean, that a majority would or should do anything it felt an impulse to do. Every advocate of democracy of whom I am aware, and every friendly definition of it, includes the idea of restraints on majorities." Dahl, A Preface to Democratic Theory, 36 (1956). Again, " * * * neither, on the other side, does the majority principle require (as it is sometimes thought to) that every majority wish, even if it could be known, should be enacted in the face of intense competition. Rigid adherence to the letter of any one of its principles may wreck any system." Mayo, Introduction to Democratic Theory, 169 (1960). See also Thorson, The Logic of Democracy, 151–163 (1963).

The decisions bear out these limitations. One of the forms of "restraints on majorities" has been the extra majority requirement for specified measures. This court itself has upheld the extra majority requirement for highway bonds. Waugh v. Shirer, 216 Iowa 468, 249 N.W. 246. Various extra majority provisions have been applied in bond elections. Bauch v. City of Cabool, 165 Mo.App. 486, 148 S.W. 1003 (two-thirds of legal voters for waterworks bonds); Varney v. City of Albuquerque, 40 N.M. 90, 55 P.2d 40 (two-thirds for auditorium bonds); State ex rel. City of Pauls Valley v. Williamson, 202 Okl. 338, 213 P.2d 852 (two-thirds for bridge bonds); State ex rel. Buck v. Whorton, 48 S.D. 332, 204 N.W. 169 (three-fifths for school bonds); State v. Town of Newport, 70 Wash. 286, 126 P. 637 (three-fifths for waterworks bonds); Robb v. City of Tacoma, 175 Wash. 580, 28 P.2d 327 (three-

fifths of vote at preceding election, for sewer bonds); Union High School District No. 1, Skagit County v. Taxpayers of Union High School District No. 1, 26 Wash. 2d 1, 172 P.2d 591 (three-fifths of vote on proposition and also 40% of vote at general election, for school bonds); Henderson v. Town of Tumwater, 46 Wash.2d 758, 285 P.2d 119 (three-fifths and 50% of general election, for municipal bonds); List v. City of Wheeling, 7 W.Va. 501 (60% for bonds to subsidize railroad). Similar extra majority provisions have been applied in other elections. Vance v. Austell, 45 Ark. 400 (to move county seat—otherwise county seat could be shifted back and forth as towns vied for it); Dunn v. Lott, 67 Ark. 591, 58 S.W. 375 (same); Alexander v. People, 7 Colo. 155, 2 P. 894 (same); State ex rel. Davis v. White, 162 Mo. 533, 63 S.W. 104 (same); Reineman v. Covington, C. & B. H. R. R., 7 Neb. 310 (to contribute to railroad construction); Packard v. Nelson, 34 Neb. 162, 51 N.W. 648 (to divide county); State ex rel. Fowlie v. Painter, 34 Neb. 173, 51 N.W. 652 (same); Pinellas County v. Laumer, 94 So.2d 837 (Fla.) (to zone an area); Bee v. City of Huntington, 114 W.Va. 40, 171 S.E. 539 (to levy extra taxes). See also Opinion to the Governor, 74 R.I. 45, 47, 58 A.2d 559 (for questions submitted to voters "the general assembly may require more than a mere majority by providing, for example, that two-thirds or three-fourths or other major fraction of all votes cast in the election or of those actually cast on the particular proposition shall be necessary"). Sometimes provisions require that the "yes" votes reach a specified proportion of the voters in the area or of the total vote at the election or at a preceding election; such provisions may actually result in an extra majority requirement for the vote on the particular proposition. Code, 1966, § 407.10; Annotation, 131 A.L.R. 1382.

Moreover, throughout our history extra majorities have in fact been required for action of various kinds. The United States Constitution requires a two-thirds

vote of both chambers of Congress for a resolution to amend the Constitution, to pass a vetoed bill, and to remove disabilities; a two-thirds vote of either chamber to expel a member; and a two-thirds vote of the Senate to ratify a treaty or to impeach. U.S.Const. art. I, §§ 3, 5, 7, art. II, § 2, art. V, Amend. XIV, § 3. Likewise, the Iowa Constitution imposes a proportion of two-thirds to expel a member of the General Assembly, to override a veto, to impeach, to allow extra compensation, and to amend or repeal an exclusive privilege. Art. III, §§ 9, 16, 19, 31, art. VIII, § 12.

By statute Congress has required a two-thirds vote of producers for the imposition of various agricultural controls. 7 U.S.C. A. §§ 1312 (tobacco), 1343 (cotton), 1358 (peanuts), 1442 (corn). The Iowa General Assembly has imposed a three-fifths requirement to issue bonds, to extend the time for leasing school buildings, to incur area school indebtedness, to tax more than ten mills for school indebtedness, and to remonstrate against street improvements. Code, 1966, §§ 75.1, 278.1, 280A.21, 298.18, 391.23. It has imposed a two-thirds vote requirement in the Senate to confirm appointment of the state comptroller. § 8.4. It has required a like proportion to move some county seats. § 353.14.

The same is true in other settings. People gathering in meetings frequently employ rules requiring an extra proportion of the vote for certain action, so that the meeting will be conducted with consideration for the wishes of all. "There has been established as a compromise between the rights of the individual and the rights of the assembly the principle that a two-thirds vote is required to adopt any motion that suspends or modifies a rule or order previously adopted; or prevents the introduction of a question for consideration; or closes, or limits, or extends the limits of debate; or limits the freedom of nomination or voting; or closes nominations or the polls; or deprives one of membership or office." Robert's Rules of Order, 204

(1951). In our system of government, some decisions even require unanimity. 89 C.J.S. Trial § 494, p. 156. Thus if a jury stands 11 to one for the plaintiff in a jurisdiction requiring a unanimous verdict, the vote of each of the 11 is one, and the vote of the twelfth juror is one. Yet the plaintiff will not prevail, for the proportion required for decision is 100%.

Jefferson recognized that provision may be made for departures from simple majority rule. "The voice of the majority decides; for the *lex majoris partis* is the law of all councils, elections, etc., *where not otherwise expressly provided.*" (Latter italics added.) Jefferson's Manual, § 741.13, from Rules and Manual, U. S. Senate (1967). Thus the Senate rules expressly require a two-thirds vote to make a subject special order of business, to close debate, or to postpone consideration of a treaty indefinitely. Rules and Manual, supra, Rules X, XXII, XXXVII(1). Indeed, here too some decisions require unanimity. Rules III, VII(3), XIII(1). Similarly the House requires a two-thirds vote to consider a special rule immediately, to dispense with the call of the private calendar or with calendar Wednesday, or to suspend the rules. Rules and Practice, U. S. House of Representatives, Rules XI, XXIV(6) and (7), XXVII(1) (91st Cong. 1969). The Iowa General Assembly also requires an extra majority in various situations. The vote of 41 senators out of 62 is necessary to suspend the Iowa Senate rules or take up a tabled motion, and the vote of two-thirds of the representatives is required to suspend or change a standing House rule or take a bill from the table. Rules of Procedure, 63rd G.A. of Iowa, Senate Rule 26, House Rule 8 (1969).

■ While simple majority rule is a basic tenet of our system, history and practice demonstrate that the rule is not invariable.

III. *Basis for Departure.* Is there justification here for departing from simple majority rule?

The statutes before the court relate to general obligation bonds. Code, 1966, § 76.2. Bonds of that kind are amortized with interest over a period not exceeding 20 years. § 73.1. They constitute a contractual obligation which cannot be impaired. U.S.Const. art. I, § 10; Wolff v. City of New Orleans, 103 U.S. 358, 26 L. Ed. 395. Levy of taxes to pay them can be compelled by mandamus. In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 21 L.Ed. 216. General obligation bonds are considerably different from revenue bonds that do not pledge the credit of the governmental subdivision. Revenue bonds may sometimes be issued on simple majority vote. Code, 1966, § 368.65.

In affluent times bond issues may be voted readily, for taxes are bearable and the possibility of less prosperous days may be overlooked. If hard times come, the operating expenses of the governmental subdivision may be reduced, but the levy for the bonds remains a fixed charge. Thus the voters may impose a long-term, unalterable obligation on themselves for good times and bad—to say nothing of the burden they place on taxpayers subsequently coming into the district who had no opportunity to vote on the question.

The general statute before us, § 75.1, reflects those considerations. It was enacted in 1931 following the high times of the twenties and near the onset of the depression. 44 G.A. ch. 21 (1931). The history of state and local debt and default, from the Revolution to World War I, is traced in Buehler, Public Finance, at 682–85 (1948). He continues (685):

"The weaknesses of government borrowing become crucial when debts grow so burdensome that many debtor governments default or repudiate their obligations. This is particularly likely to happen when fixed debt charges become heavy and revenues decline because of fundamentally unfavorable economic conditions. The period after the First World War was marked by rapid expansion of local debts to finance highway construction, schools, sewers, and other costly public works. This was an era of popular speculation in securities, commodities, and real estate, and it is little wonder that local governments were caught in the maelstrom of economic crisis and depression. Even before the general economic collapse in 1929, in some areas special assessments and taxes on real estate became more and more delinquent; yet the burden of debt remained at its previous high level. Expenditures were cut in some directions but increased in others, especially for social relief. For more than a generation defaults on state and local securities had been practically unknown and investors had been lulled into complacency by their ignorance of the fundamental trend. They gleefully bought gilt-edged bonds of cities and other local governments without a doubt as to their safety. A few defaults gave warning of what was to come later. Two Texas cities defaulted in 1924 and fifty-six local governments in Washington defaulted in 1925. The bursting of the bubble of speculation in Florida real estate in 1926 ushered in a wave of defaults in Florida cities, which found themselves strangling with crushing debts. A few defaults also appeared in other states at the same time but the country soon forgot most of them.

"The general wave of defaults did not become evident until the depression reached a crucial state after 1929, when local governments found that heavy debts imprudently incurred during the years of seemingly endless prosperity had become unmanageable. A survey early in 1933 found three states, Arkansas, Louisiana, and South Carolina, in default, along with 1,002 local governments. The number of defaults among local governments reported by *Bond Buyer* increased to a maximum of 3,159 in 1936, and then gradually abated."

Like accounts are given in Studensky, Public Borrowing, 43–49 (1930); Kirshman, Principles of Investment, 652 (1933); Hillhouse, Municipal Bonds, 37–46 (1936); and Schultz and Harris, American Public

Finance, 558–62 (1957). See also Note, 56 Va.L.Rev. 295, 297–306.

Students of public finance are convinced of the necessity for state controls on the power of local governments to incur indebtedness. As stated in Bostable, Public Finance, 244 (1922):

"The American State constitutions often place limits on both State and municipal borrowing power, and the latter are also regulated by the State legislatures. The convenience indeed the necessity of some method of the kind is obvious; without it a numerical majority of the inhabitants of the district, perhaps possessing little monetary interest in its future condition, could burden all the holders of the property and future residents with a load of debt. Heavy taxation soon brings a remedy in the impatience of the taxpayers; but borrowing is, for the time, an agreeable process whose evils are only perceived later on. Thus the creation, the amount, and the *modes of repayment of debt all stand in need of due regulation by the superior authority of the state.*"

See also Buehler, Public Finance, 688 (1948) ("Local governments have, in general, suffered most from untrammeled expenditures, tax delinquency, and the mismanagement of credit, and are most in need of debt supervision and control by higher authority.").

State control of local governmental debt takes various forms. Thus, a debt ceiling may be imposed based on assessed valuation of property; a maximum may be set on the tax rate to pay bonds and interest; extra majorities at bond elections may be required; or approval of issuance of bonds by higher officials may be necessary. Studenski, Taxation and Public Policy, ch. VII (1936); Note, 56 Va.L.Rev. 295, 300–02. The Iowa Constitution and statutes impose various of these controls. E. g., Iowa Const. art. XI, § 3; Code, 1966, §§ 296.1, 407.1, 407.2, 23.1, 23.7, 23.15.

One of the controls imposed by our legislature is the extra majority requirement now before us. Constitutional and statutory provisions of this sort are not uncommon in America for school and municipal bonds. 79 C.J.S. Schools and School Districts § 366, pp. 103–04; 64 C.J.S. Municipal Corporations § 1927, pp. 542–544; 43 Am.Jur., Public Securities and Obligations, § 101, p. 352 ("The favorable vote required may be a mere majority or it may be more, depending on the wording of the controlling provisions"); Comment, 1 Vill.L.Rev. 72, 77 ("Statutes and constitutions usually stipulate what constitutes an affirmative vote. Generally it is a majority. It may be more."); Note, 56 Va.L.Rev. 295, 331–34 app.

Ordinarily, "All presumptions are indulged in favor of constitutionality; one who attacks a statute, alleging unconstitutionality, must prove its invalidity beyond a reasonable doubt; that a law may work hardship does not render it unconstitutional; if any reasonable basis may be conceived which supports the statute, it will be upheld, and the challenger must negative all possible bases; the courts are not concerned with the wisdom, justice, policy, or expediency of a statute; and we will adopt a liberal interpretation of the constitution *in favor of the constitutionality of legislation.*" Danner v. Hass, 257 Iowa 654, 661, 134 N.W.2d 534, 539.

It is said, however, that statutes of the kind before the court are tested differently; they are valid only if a "rational basis" exists for them, or perhaps only if a "compelling interest" underlies them. Note, 70 Colum.L.Rev. 486, 497.

Assuming the tests of constitutionality are as mechanical as that, we think a plausible case can be made that the rational basis or traditional test is the more appropriate standard here. The legislature has not created "suspect categories" predicated on race, occupation, parentage, property ownership, or place of residence—the invidious factors involved in decisions which talk

about a compelling interest. Note, 56 Va. L.Rev. 295, 313. Voting in bond elections is at large and each voter is tallied as one at the polls irrespective of where he lives in the district or which way he casts his ballot—just as each farmer's vote is tallied as one in elections under federal farm programs. The legislature is pursuing a legitimate objective, fiscal stability. Cf. Reynolds v. Sims, 377 U.S. 533, 579, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506, 537 ("legitimate considerations incident to the effectuation of a rational state policy"); Levy v. Louisiana, 391 U.S. 68, 71, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436, 439 ("Though the test has been variously stated, the end result is whether the line drawn is a rational one."); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491, 503 (U.S.) ("rationally based"); see also McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed. 2d 739.

As stated in Brenner v. School District of Kansas City, D.C., 315 F.Supp. 627, 633–634 (three-judge court):

"The primary difficulty with plaintiffs' 'one-man, one-vote' argument is that it fails to take into account the factual situations presented in the apportionment cases in which that principle was articulated and applied. Those cases related to elections in which representatives are chosen to represent the people. The weight of votes cast in one district were in fact diluted or enhanced when compared to the votes cast for the same representative elected from another district. Reynolds v. Sims, 377 U. S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), was explicitly based on the rationale that where such overweight or underweight results from the accident of particular voters' place of residence, the resultant dilution 'impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, Brown v.

Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, or economic status, Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811' (Reynolds v. Sims, 377 U.S. at 566, 84 S.Ct. at 1383).

"But the Court explicitly recognized in Reynolds v. Sims that 'our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures.' A particular State's determination that no school district shall issue school bonds or increase its tax levy unless two thirds of the voters approve simply does not involve questions which relate to the majority control of any legislative body. The purpose of a school referendum simply is not concerned with the election of any public official."

Also (315 F.Supp. at 634):

"The important consideration which must be kept in focus is that a school bond or levy election is an entirely different sort of political process than that involved in the election of a public official. No actual classification of groups of voters is involved in a school referendum election. No one even knows who is going to vote 'yes' or who is going to vote 'no.' No one knows how the election will be decided until the votes are counted."

Also (315 F.Supp. at 636–637):

"There are cases which do provide appropriate guidelines for a possible equal protection analysis. McDonald v. Board of Election, 394 U.S. 802, 806, 89 S.Ct. 1404, 1407, 22 L.Ed.2d 739, (1969), teaches that, as a point of beginning, 'we must determine initially how stringent a standard to use in evaluating the classifications made [by the State law under attack] and whether the distinctions must be justified by a compelling State interest, * * *.' In many cases which involved particular facets of the fundamental right of suf-

frage, the Court has applied a stringent and exacting standard. See, e. g., *Kramer, Cipriano, Kolodziejski*. But the traditional rather than the exacting standard was applied in *McDonald*, a case involving Illinois' absentee ballot procedures. The traditional standard was held to be applicable in *McDonald* because (1) 'the distinctions * * * are not drawn on the basis of wealth or race' and (2) because 'there is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellant's ability to exercise the fundamental right to vote.' The Court stated that 'It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots.'

"The traditional standard applied in *McDonald*, was based on McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947); and Lindsley v. Natural Carbonic Gas., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). Such a standard requires only that the classifications bear some rational relationship to a legitimate state end and will be held to violate the Equal Protection Clause only if the classifications are based on reasons totally unrelated to the pursuit of that goal. Under the traditional standard statutory classifications will be set aside only if no grounds can be conceived to justify them.

" * * * 'If the political process is to retain the flexibility necessary for compromise and experimentation, all voting restrictions cannot be put to the test of justification by a compelling state interest.' (56 Virginia Law Review, at 317)."

■ The court concluded in the Brenner case that if the traditional or rational basis test is applied, the extra majority voting requirement for bond elections is valid, and we are clear that this is so. Considering the history of bond delinquencies by local governmental bodies resulting from unrestrained use of credit, plainly the legislature has good reason for putting on the brakes. It is not for us to say which ones of the controls ought to be employed. Moreover, whether we happen to consider the extra majority requirement a wise control is beside the point. That is a policy determination for the legislature.

But we reach the same result if a compelling interest must exist. Local government constitutes the foundation of our whole structure. Continued operation of local governmental units requires continued solvency of those units. Thus the whole subject of discreet use of credit by local government is not simply a matter of protecting bond buyers against worthless paper, or of protecting taxpayers against taxes they cannot pay in bad times, or even of protecting the "credit rating" of governmental units who need to borrow funds from time to time. The existence and operation of governmental units are at stake, and the state has a compelling interest in seeing that those units are maintained in healthy financial condition. The extra majority requirement, if a legislature chooses to employ it, is an effective tool for keeping fiscal affairs in hand. We agree with the court, after upholding a two-thirds requirement under the traditional requirement, when it said in Brenner v. School District of Kansas City, 315 F.Supp. 627, 642 (three-judge court): "If that requirement is subject to a more exacting standard, we find and conclude that it is justified to meet a legitimate and compelling State need."

We think both rational and compelling bases exist for the requirement that the outcome of bond elections " 'rest on widespread consent rather than teetering on the knife-edge of a transient 51 per cent.' " Bogert v. Kinzer, 93 Idaho 515, 524, 465 P. 2d 639, 648.

Affirmed.

MOORE, C. J., and LARSON, STUART, MASON and LeGRAND, JJ., concur.

BECKER, RAWLINGS, and REES, JJ., dissent.

BECKER, Justice.

I respectfully dissent.

The precise issue before us; i.e., whether extraordinary majority requirements in bond issue cases are constitutional, has been decided by three states and a three-judge federal court in the past 15 months. Idaho has held such a requirement constitutional. Bogert v. Kinzer, 93 Idaho 515, 465 P.2d 639 (March 1970). A three-judge federal court held Missouri's constitutional two-thirds-majority requirement constitutional. Brenner v. School District of Kansas City, D.C., 315 F.Supp. 627 (August 1970). West Virginia and California held such requirements unconstitutional and therefore void. Lance v. Board of Education of County of Roane, 170 S.E.2d 783 (W.Va., July 1969); Westbrook v. Mihaly, 2 Cal.3d 765, 87 Cal.Rptr. 839, 471 P.2d 487 (July 1970). The latter two states reach the proper conclusion.

I. Division I of the majority opinion recognizes the extraordinary majority requirement is in fact discriminatory against the "yes" voters. One cannot quarrel with this conclusion.

II. Division II of the opinion recognizes that simple majority rule is clearly a basic tenet of our political system. The opinion then proceeds to demonstrate that simple majority rule is not invariably applied in our American system. This latter demonstration is beside the point. The United States Supreme Court has said that weighted voting may be allowed if there is such a compelling state interest as to require such allowance. Westbrook v. Mihaly, supra, and Rimarcik v. Johansen, 310 F.Supp. 61 (D.C. 1970). For this reason the decision in the instant case does not hinge on whether all statutes requiring an extraordinary majority are unconstitutional. The answer depends on the state interest involved.

III. In the latter half of Division III the majority first addresses itself to the basic question of whether the state need only show a rational basis for the discrimination inherent in weighted voting: or whether it must show a compelling state interest to justify such discrimination. The court states it does not make any difference which approach is used; the state has shown both a rational basis and a compelling state interest. I respectfully disagree.

IV. The necessity for showing compelling state interest is fundamental to the decision reached here. This is demonstrated by the majority opinion itself. The opinion builds a careful case for showing the discrimination practiced here has a rational basis. The compelling state interest portion of the division is disposed of in one paragraph which assumes, rather than demonstrates, a compelling state interest. We must therefore first inquire as to the validity of use of the rational basis test.

Ordinarily there is a strong presumption of constitutionality accorded the statutes of a state. We have said, " * * * a statute will not be declared unconstitutional unless it clearly, palpably, and without doubt infringes the constitution." Lee Enterprises, Inc. v. Iowa State Tax Comm'n., (Iowa 1968) 162 N.W.2d 730, 737. However, this well-settled general rule is not applicable to statutes involving voting rights.

Reynolds v. Sims, 377 U.S. 533, 561, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) states: " * * * Like Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655, such a case 'touches a sensitive and important area of human rights,' and 'involves one of the basic civil rights of man,' presenting questions of alleged 'invidious discriminations * * * against groups or types of individuals in violation of the constitutional guaranty of just and equal laws.' 316 U.S. at 536, 541, 62 S.Ct.

[1110] at 1113 [86 L.Ed. at 1657, 1660]. Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. * * *." Therefore the court concluded, "the right of citizens to vote must be carefully and meticulously scrutinized."

This was followed by Kramer v. Union Free Sch. Dist., 395 U.S. 621, 627–628, 89 S.Ct. 1886, 1890, 1892–1893, 23 L.Ed.2d 583, 590, 593 (1969), which states:

"* * * Accordingly, when we are reviewing statutes which deny some residents the right to vote, *the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable.* * * *.

"* * * *But the issue is not whether the legislative judgments are rational. A more exacting standard obtains.* The issue is whether the § 2012 requirements do in fact sufficiently further *a compelling state interest* to justify denying the franchise to appellant and members of his class. * * *." (Emphasis supplied).

In Cipriano v. Houma, infra, the court said: "* * * 'the Court must determine whether exclusions are necessary to promote a compelling state interest.' * * * .

"* * * When, as in this case, the State's sole justification for the statute is that the classification provides a 'rational basis' for limiting the franchise to those voters with a 'special interest,' The statute clearly does not meet the 'exacting standard of precision we require of statutes which selectively distribute the franchise.'" (Loc. cit. 395 U.S. 701, 89 S.Ct. 1897 at page 1899–1900, 23 L.Ed.2d 647 at page 650, 652).

Most recently the Supreme Court in City of Phoenix v. Kolodziejski, (June 23, 1970) 399 U.S. 204, 90 S.Ct. 1990, 1994, 26 L.Ed.2d 523, 527–528, stated: "* * * Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, *the Constitution does not permit weighted voting* or the exclusion of otherwise qualified citizens from the franchise. * * *. Placing such power in property owners alone *can be justified only by some overriding interest* of those owners *which the State is entitled to recognize.*" (Emphasis supplied.)

It is therefore submitted that weighted voting is presumptively unconstitutional and is justified only if a compelling state interest can be demonstrated as a basis for such discrimination. Westbrook v. Mihaly, 2 Cal.3d 765, 87 Cal.Rptr. 839, 471 P.2d 487, (July 15, 1970); Rimarcik v. Johansen, 310 F.Supp. 61 (1970). If this is true, the rational basis demonstrated by the majority is clearly insufficient.

V. In approaching the question of compelling state interest it is also well to be cognizant of the compelling voter interest. The question of whether an extraordinary majority requirement is in fact discriminatory does not require extended discussion. The effect of a 60 percent majority requirement in bond issue elections is to debase or dilute the weight of an affirmative vote in relation to a negative vote. The statement made in Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 809, 9 L.Ed.2d 821, 829, (1963) is analogous: "* * * If a State in a statewide election weighted the male vote more heavily than the female vote or the white vote more heavily than the Negro vote, none could successfully contend that that discrimination was allowable. * * *." It is equally apparent that when the vote is weighted because it is negative rather than affirmative, discrimination occurs. Westbrook v. Mihaly, 2 Cal.3d 765, 87 Cal.Rptr. 839, 471 P.2d 487.

In Cipriano v. Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647, 651, (1969), the U.S. Supreme Court said: "For, as we noted in Carrington v. Rash, 380 U.S. 89, 94, 85 S.Ct. 775, 13 L.Ed.2d 675, 679

(1965), ' "[f]encing out" from the franchise a sector of the population because of the way they may vote is constitutionally impermissible.' " Whether the voter is denied the right to vote entirely or has his vote diluted, the principle applies.

We should note the practical effect of this discriminatory effect on the Iowa school bond issue experience. In Gibson v. Winterset Comm. Sch. Dist., 258 Iowa 440, 138 N.W.2d 112 (1965), the opinion shows the same bond issue was submitted six times; the record (but not the opinon) indicates the bond issue failed six times over a period of seven years. The vote counts were:

|      | Year | Amount | Yea votes | Nay votes |
|------|------|--------|-----------|-----------|
|      | 1959 | $850,000 | 38% | 62% |
|      | 1960 | 890,000 | 43% | 57% |
|      | 1963 | 845,000 | 50.5% | 49.5% |
| Jan. | 1964 | 845,000 | 56.7% | 43.3% |
| July | 1964 | 845,000 | 58.8% | 41.2% |
|      | 1965 | 845,000 | 58.4% | 41.6% 1 |

The amicus curiae brief by the Attorney General supplies a list of school bond elections in Iowa for the 1960–1970 decennium. The list indicates the Winterset experience is not unusual. It shows 384 elections. 100 elections resulted in affirmative votes of over 60 percent; 127 elections received affirmative votes of less than 50 percent and would have been defeated in any event; 114 elections resulted in a vote of over 50 percent but less than 60 percent. This last category represents 29.7 percent of all elections held in which the will of clear majority of the electorate was thwarted. These results occurred after a majority of the school board (elected by majority vote) determined there was sufficient need for the improvements to justify submitting the matter to the electorate.

Stated otherwise a majority of the voting electorate wanted the bonds issued in 56 percent of the elections but the majority prevailed only 26 percent of the time. It is fair to say that a clear majority of voters also have a compelling interest; not in weighted voting but in equal treatment.

VI. There is an inherent contradiction in the argument against the so-called tyranny of the majority. The contradiction is cloaked by a quote from the New Republic (September 1969) magazine found in Bogert v. Kinzer, 93 Idaho 515, 465 P.2d 639, "so that government may rest on widespread consent rather than teetering on the knife-edge of a transient 51 percent." The record of school bond elections in Iowa is otherwise. The knife edge is just as sharp at 61 percent as it is at 51 percent. Indeed, for those who have produced a substantial majority in election after election but have been thwarted by a 40 percent minority, the knife may be even sharper at the higher figure.

VII. The arguments in favor of finding a compelling state interest to justify an extraordinary majority requirement in bond issue cases are largely economic. The unfortunate early history of bonded indebtedness of local government units has been reviewed in detail: Cf. Note, Judicial Activism and Municipal Bonds: Killing Two-Thirds With One Stone?, (March 1970) 56 Virginia Law Rev. 295, 300, 301. The over-extension of municipal bonded indebtedness in the last half of the 19th Century is traced and the reaction noted:

" * * * The Panic of 1873 and the end of 'cheap money' hopes stirred a reaction against unrestricted borrowing. As defaults multiplied, taxpayers, bondholders and grange units united to oppose easy borrowing. Constitutional conventions were called in many states, resulting in the imposition of debt ceilings and referendum requirements." Iowa did not amend its constitution as did many other states. Instead it waited until 1931, at the beginning of the depression, to impose the 60 percent requirement by legislative action, Iowa

1. In March 1966 a $500,000 issue was submitted and lost; 66 percent "nay", 34 percent "yea". In October 1966 a $982,-000 issue was approved by 63.6 percent of the voters. Appendix to Attorney General's Amicus Curiae Brief.

Code, 1966, section 75.1. At the present time 23 of the 50 states require an extraordinary majority; 27 do not. Appendix to note, 56 Virginia Law Rev., page 331.

The California Supreme Court in Westbrook v. Mihaly, supra, makes the following statements in relation to the compelling interest problem:

"We do not think respondents have demonstrated that bond-finance decisions are fundamentally different from many other political decisions made by a majority vote or by representatives elected by a majority vote. Even assuming, however, that respondents had done so we think their argument fails at another level. This justification for the extraordinary majority requirement rests on the premise that a decision to *undertake* a project such as the construction of schools and playgrounds is qualitatively different from a decision *not to* do so. This, in turn, is based on the assumption that spending money is a more serious matter than not spending it and, consequently, must be justified whereas frugality is self-justifying. A predisposition to thrift may serve a man well. It does not, however, justify governmental inertia, especially when government is faced with critical social problems demanding urgent and sometimes costly remedies. There is no presumption in favor of inaction, as the United States Supreme Court observed in Avery v. Midland County, *supra,* 390 U.S. 474, 484, 88 S.Ct. 1114, 1120 [20 L.Ed.2d 45]: '[W]e might point out that a decision not to exercise a function within [local government's] power—a decision, for example, not to build an airport or a library, or not to participate in the federal food stamp program—is just as much a decision affecting all citizens * * * as an affirmative decision.'

"In sum, we do not believe that the nature of general obligation bond financing warrants diluting the votes of those who want action, in order to institutionalize a preference for the interests of those who want stasis. (Hunter v. Erickson, *supra,*

393 U.S. 385, 392–393, 89 S.Ct. 557 [21 L. Ed.2d 616].)" (Loc. cit. 87 Cal.Rptr. at page 859, 471 P.2d at page 507.)

In Westbrook v. Mihaly, supra, the court concluded: "We find nothing to support respondents' grim warnings of financial disaster in the absence of a two-thirds vote requirement. We must, therefore, conclude that that provision is not necessary to insure the solvency of our local governments." The 27 states that do not require an extraordinary majority have not been shown to have suffered financial catastrophe nor is there any evidence that their bonds are less acceptable on the market. The basic reasons for rejecting the economic argument are set forth in Public Affairs Report, Bulletin of the Institute of Governmental Studies, University of California, Berkeley, Vol. 10, No. 4, August 1969:

"Regardless of whether the requirement could be considered appropriate for the conditions prevailing in the late 1800's, it is obvious that virtually every factor that may then have been relevant has since changed drastically. For example, great improvements have been made in the quality and integrity both of the legislative processes and of financial administration. Local legislative bodies of the present are far more responsible than their counterparts were a century ago. A corps of highly trained professional administrators, finance officers, and financial/bond consultants is available to serve even the smallest jurisdictions.

"Numerous modern procedures of fiscal administration have been developed since 1879. A host of auditing and financial accounting requirements have been written into law. The bond market itself is subject to safeguards precluding most of the practices that the 1879 constitutional provision was probably intended to correct. For example, greatly improved reporting procedures are now in effect, assuring that full and accurate information on the financial and legal ramifications of individual

bond issues is supplied to prospective buyers. Highly qualified bond consulting firms, specialized legal counsel, and careful bond issue evaluation by respected national rating agencies, have all built strong public confidence in most local bond offerings. The sense of security appears to be general, and is not limited to states requiring an extraordinary majority vote. This fact, in itself, strongly suggests that the many institutional and procedural improvements outlined here—and not the two-thirds requirement—are responsible for the soundness of modern local capital outlay finance."

VIII. The arguments in favor of weighted voting seem to assume that all adverse votes are motivated by economic considerations alone and should therefore receive additional weight. The motivation for a negative vote lies in the heart and mind of the voter. Many negative votes are cast for other than purely economic reasons; to name a few, the voter does not like the school board membership or the superintendent; the parochial school oriented voters decide to vote "no" in large numbers; the school will be built on the other side of town or in a different town; the voter does not like swimming pools in high schools; there is need for a grade school on the voters' side of the district which has been left out of the program; the whole program will advantage one economic or ethnic group more than another. There are a host of other motivations for voting "no". Their validity need be apparent only to the person voting.

Once the vote is weighted in favor of the negative side it is so weighted for all votes cast. It need hardly be argued that negative votes based on some of the above motivations should not, as a matter of compelling state interest, count for 1.5 times as much as the affirmative vote.

IX. Further, the state has adequate sources for controlling the amounts of bonded indebtedness without resorting to a discriminatory vote formula. Controls have already been exercised: (1) limitation of bonded indebtedness to a percentage of the value of the property within the taxing district, Iowa Constitution, Article XI, section 3; (2) requirement that a referendum be held, (3) bonds to mature in a specified time, (4) limitation on interest rates, Iowa Code, section 296.1, and (5) requirements for public hearings before public improvements contracts in excess of $5000 are undertaken, Iowa Code, 1966, chapter 23. It seems needless to add that the legislature could prohibit bonded indebtedness altogether or could limit such indebtedness to a fixed amount.

The referendum requirement is itself a legislative control. But when this control is used it must comply with the United States Constitution. As stated in Lance v. Board of Education of County of Roane, 170 S.E.2d 783, 791 (1969 W.Va.):

" * * * when the voter was constitutionally granted the right to vote on these important issues, he thereby became guaranteed the equal protection of the law under the Fourteenth Amendment and the constitutional right to have his vote accorded the same weight, effect and force as that of any other person's vote, * * *." This is the controlling rule in the absence of a showing of compelling state interest. None is shown here.

X. The state relies heavily on Waugh v. Shirer, 216 Iowa 468, 249 N.W. 246 (1933). The 60 percent majority requirement in section 75.1 was held to be constitutional as it applied to a county bond issue for road building purposes. Federal constitutional issues were not raised or decided. The one-person, one-vote principle contained in Gray v. Sanders, supra, had not been formulated in 1933. In light of such development, Waugh v. Shirer, supra, should be overruled.

XI. A reversal of this case and a holding that the extraordinary voting majority requirements in our statute are unconstitutional would require consideration of the prospective-retrospective problems inher-

ent in such decision. In their reply brief plaintiffs with commendable frankness acknowledge there would probably be difficulties arising from the grant of a writ of mandamus in this case at this time. The reasons given are the success of the school board in taking care of part of their building program, changes in building costs and interest rates on the bonds. While it is not directly necessary to this dissent, it seems appropriate to suggest this is one of the rare cases which might be made wholly prospective in its effect; that is, the ruling would affect no election held before the date of the opinion and would not affect the election in question. This procedure was used by the Supreme Court of California in Westbrook v. Mihaly, 2 Cal.3d 765, 87 Cal.Rptr. 839, 471 P.2d 487 (1970), in a super majority bond issue case and by the Minnesota Supreme Court in Spanel v. Mounds View Sch. Dist. No. 621, 264 Minn. 279, 118 N.W.2d 795, 803 (1962), in connection with governmental immunity. These problems have been handled by this court and other courts in similar cases. Cf. Kruidenier v. McCulloch, 258 Iowa 1121, 142 N.W.2d 355; In Re Legislative Districting of General Assembly, 175 N. W.2d 20 (Iowa 1970). They present no insurmountable difficulties.

For the foregoing reasons I would hold the 60 percent majority requirements found in sections 75.1 and 296.6, Iowa Code, 1966, are unconstitutional in that they violate Article I, section 6 of the Iowa Constitution and Amendment 14 of the United States Constitution. Meyer v. Campbell, 260 Iowa 1346, 152 N.W.2d 617, 621 (1967), quotes the controlling principle from Gray v. Sanders, 372 U.S. 368, 83 S. Ct. 801, 9 L.Ed.2d 821 (1963):

" * * * 'The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications.' "

RAWLINGS and REES, JJ., join in this dissent.